# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF IOWA

| IN RE: | ) | |
|---|---|---|
| | ) | Chapter 7 |
| Molly E. Grover, | ) | |
| | ) | |
| Debtor. | ) | Bankruptcy No. 12-01069 |
| | ) | |

## ORDER ON MOTION TO DISMISS FOR ABUSE

On July 02, 2012, the U.S. Trustee brought a Motion to Dismiss under 11 U.S.C. § 707(b). The Court held an evidentiary hearing that started but was not completed on November 5, 2012. The evidentiary hearing resumed and was completed on January 3, 2013. John F. Schmillen appeared on behalf of the U.S. Trustee. Rush Shortley and Lew Eells appeared on behalf of Creditor Northside Bank which joined the Motion. Brian Peters appeared for Debtor, Molly Grover. After the hearing, the Court took the matter under advisement. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

## STATEMENT OF THE CASE

The U.S. Trustee has moved to dismiss Debtor's Chapter 7 bankruptcy under § 707(b) as an "abuse" of the bankruptcy system. The U.S. Trustee claims that the Debtor has improperly classified a large debt—from a deficiency after a foreclosure sale on her current residence—as non-consumer debt. The U.S.

Trustee argues that if the debt is properly classified as a consumer debt, then the formulas provided in § 707(b) indicate abuse of the bankruptcy process.

Trustee argues that the presumption of abuse arises under § 707(b)(2) and Debtor cannot rebut the presumption. Trustee also argues that even if Debtor somehow rebutted the presumption, the Court should still dismiss on the "totality of the circumstances" under § 707(b)(3). Northside Bank has joined in the U.S. Trustee's Motion to Dismiss in its entirety.

Debtor argues the particular debt at issue is a business debt because she and her then husband bought the home with the intent to profit by fixing it up and flipping it in a fast increasing real estate market. Debtor also asserts it is a business debt because they used it as a rental property for a period of time after moving.

Debtor contends that all debts were properly scheduled and no presumption of abuse arises. However, if the presumption of abuse arises, Debtor argues she has rebutted that presumption. She relies on similar evidence to resist the alternative arguments based on the "totality of the circumstances." The Court disagrees with Debtor and finds this is a case of abusive filing that should be dismissed.

## FINDINGS OF FACT

On May 29, 2012, Debtor filed a voluntary Chapter 7 petition. Debtor currently works as CEO of the Dubuque Chamber of Commerce in Dubuque,

Iowa. Debtor and her then-husband (the "couple") moved to Dubuque in 2007, from Cartersville, Georgia, where Debtor held a similar position.

In late 2005, the couple purchased a new home in Georgia. Debtor testified that when they bought the house, she had already begun the search for a new Chamber job. She expected the job search to take approximately a year. The couple expected to move as soon as Debtor found her next position. Expecting to be in Georgia for only about a year, Debtor testified the couple's intent was to buy the home which was already listed below its appraised value, make some home improvements and renovations, and sell it for a profit.

Debtor testified that the new President of Northside Bank in Georgia told her about the home. She claims the Bank President suggested Northside could help them obtain financing for a second mortgage to pay for the improvements/renovations. In October of 2005, the couple purchased the home. It appraised at $340,000. They did not put much equity into the home. Instead, they got a first mortgage and second mortgage to cover over 99% of the purchase price. In February of 2006, the couple refinanced their second mortgage through Northside Bank as initially intended. Northside's loan totaled $114,399.00. This allowed the couple to pay off the original second mortgage and have additional funds for the renovations. Northside Bank based this second mortgage loan on an increased appraisal value of $380,000.

3

In late 2006, Debtor was hired for the position she now holds in Dubuque, Iowa. The couple relocated to Iowa, initially renting and eventually buying a house in Iowa. Unfortunately, the real estate market in Georgia had changed significantly at that time. The couple was unable to sell the Georgia house for what they expected. The couple decided to keep the house, try to rent it out, and wait for housing prices to recover. The market has not recovered.

After renting the house for a period of time, the couple could no longer afford the Georgia mortgage. The couple attempted a short sale but was unsuccessful. The bank holding the first mortgage foreclosed on the Georgia house. Northside Bank, the holder of the second mortgage, was left with a large deficiency.

In her Chapter 7 bankruptcy filing, Debtor listed the debt to Northside Bank as a "deficiency judgment on rental/investment property." (ECF Doc. No. 1, p. 30.) Debtor claimed that because her debt to Northside was a business debt, her debts as a whole were primarily business debts. (ECF Doc. No. 1, p. 1.) Northside Bank's deficiency claim on the Georgia home represents nearly 90% of all her scheduled debt. Thus, the classification of the Northside claim is determinative of whether Debtor's debts are primarily consumer or non-consumer debts.

On July 2, 2012, the U.S. Trustee filed a Motion to Dismiss claiming that Debtor had misclassified Northside Bank's claim as non-consumer business debt.

The U.S. Trustee argued that it was instead a consumer debt related to the purchase of a residence. The U.S. Trustee argues that the result of the misclassification of the claim is that the case should be dismissed under § 707(b) for abuse. Northside Bank joined the Trustee's motion. At the hearing on the Motion to Dismiss, Debtor claimed the classification of Northside's claim as a business debt was warranted. She testified that the intent of the couple in moving to the larger Georgia home was primarily to make a "business" investment. They hoped to quickly flip the house for substantially more than they paid when they moved. Debtor admitted that the couple and their children lived in the house. However, she pointed out that the house was much larger than they needed and cost nearly twice as much as their previous house. She believes this helps demonstrate the couple's investment intent. The Court finds this testimony unpersuasive.

The U.S. Trustee introduced the loan application the couple submitted in connection with the purchase of the Georgia house. It refers specifically to a "Consumer Loan" and makes no mention of a business purpose or business borrowing. The U.S. Trustee also introduced a copy of the "Disbursement Request and Authorization" the Bank issued relating to the loan. It defines the primary purpose of the loan as "personal, family, or household purposes or personal investment" and not as "business (including real estate investment)." The U.S. Trustee also introduced a copy of the June 8, 2012, Chapter 7 petition of Brent

5

Grover, Debtor's new ex-husband. He was co-purchaser of the Georgia home. His filing checked the box indicating primarily "consumer debts," not business debts. His debt load was similar to Debtor, and in particular, the deficiency on the Georgia home equity loan was 69% of his total debt. The U.S. Trustee also introduced evidence showing the loans were disposed of in a manner typical for consumer second-mortgage transactions.

Debtor did not really dispute the U.S. Trustee's evidence other than to claim it did not reflect her intent at the time. Debtor also testified about her income and expenses. She confirmed that her annual income exceeded $146,500. She also noted she may be eligible for more with raises and bonuses. Her previous two years showed income of $161,071 for 2010 and $153,516 for 2011. Using the $146,500 figure, she agreed that her monthly gross income is at least $10,946.41 and net monthly income, after taxes, is at least $7,589.52. She also confirmed her monthly expenses, listed on Schedule J, of $8,465.

She testified that her expenses were far above the norm because they were required for her job. She claimed to need lots of nice clothes, a nice car, and a nice place to live to make the right "professional" appearance. Schedule J included, among other things, a $1,200 monthly clothing expense, a $900 transportation expense, a $1,700 rent/mortgage payment, $1,000 for food, and $325 for clubs, recreation, and entertainment. She asserted repeatedly all of those expenses are

6

actual and necessary expenses given her job and related needs. The Court rejects that testimony.

## CONCLUSIONS OF LAW

Under §707(b)(1), "the court . . . may dismiss a case filed by an **individual debtor** under this chapter whose debts are **primarily consumer debts**, . . . **if** it finds that the granting of relief **would be an abuse** of the provisions of this chapter." 11 U.S.C. § 707(b)(1) (emphasis added). Debtor claims this provision does not apply because her debts are primarily business debts. The U.S. Trustee and Northside Bank strongly disagree. The first question the Court must answer is whether the debts are primarily consumer debts. In particular, the first question is whether the debt for the deficiency on Northside Bank's mortgage is a business or personal debt. That debt makes up the vast majority (90%) of debt listed. Thus, it is determinative of whether Debtor has "primarily consumer debt" and § 707(b) applies.

### I.    Are the Debts Primarily Consumer Debts?

"'[C]onsumer debt' means debt incurred by an individual **primarily** for a **personal, family, or household purpose**." 11 U.S.C. § 101(8) (emphasis added). Generally, "[t]o determine whether a debt is a consumer debt, we must examine the Debtor's purpose in incurring it." Lapke v. Mutual of Omaha Bank, 428 B.R. 839, 843 (B.A.P. 8th Cir. 2010); see also In re Palmer, 117 B.R. 443, 446 (Bankr. N.D.

7

Iowa 1990) ("In determining whether a particular debt is a consumer debt, the courts have held that the court must look to see the purpose for which the debt was incurred."). In looking at the purpose, courts generally have found a "[d]ebt secured by real property that is used as the debtor's personal residence is generally consumer debt." Lapke, 428 B.R. at 843 (citing Cox v. Fokkena, 315 B.R. 850, 855 (B.A.P. 8th Cir. 2004) (citing Zolg v. Kelly (In re Kelly), 841 F.2d 908, 912 (9th Cir. 1988))). "[I]f the debtor's purpose in incurring the debt is to **purchase a home or make improvements** to it, the **debt is clearly for family or household purposes** and **fits squarely within the definition of a consumer debt** under § 101(8)." Cox, 315 B.R. at 855 (citing Kelly, 841 F.2d at 913) (additional citations omitted) (emphasis added); see also Palmer, 117 B.R. at 447 (citing Kelly, 841 F.2d at 912–13 ("Debts incurred to purchase, finance, or improve a home are consumer debts.")).

Debtor argues against a blanket application of that rule given her testimony that the purchase of her house was motivated by profit. She points out that courts, including this one, have looked to see whether the parties purchase the asset with a profit motive.

> In determining whether a particular debt is a consumer debt, the courts have held that the court must look to see the purpose for which the debt was incurred. If the credit transaction involves a profit motive, then it is not a consumer debt. On the other hand, if a debt does not involve a business transaction or potential profit motive, then the debt is ordinarily considered a consumer debt.

8

In re Palmer, 117 B.R. 443, 446 (Bankr. N.D. Iowa 1990) (Matter of Booth, 858 F.2d 1051, 1054–55 (5th Cir. 1988)). Debtor claims that her testimony about a profit motive controls and makes the debt at issue a business debt. This Court disagrees.

At best, Debtor has made out a case of "mixed motives"—to buy a residence to live in and make a profit. The Eighth Circuit B.A.P. addressed a case of mixed motives very similar to this case. See Cox, 315 B.R. at 855–56. There too a debtor had some profit motive or investment intent when purchasing the home. Id. at 854–56. The B.A.P. specifically rejected debtors' argument "that because [the debtor] . . . bought their home for investment reasons and hoped to sell it for a profit in the future, the expenditure was an investment, not a consumer debt." Id. at 855. Debtor makes the exact same argument here. The B.A.P.'s rejection of that argument was summarized as follows: "[i]f the debtors' purpose in incurring the debt is to **purchase a home or make improvements to it**, the debt is **clearly** for family or household purposes **and fits squarely within the definition of consumer debt** under § 101(8). Id. (cited cases omitted) (emphasis added). That conclusion applies and is decisive here.

The additional rationale provided by the B.A.P. makes the application of its conclusion fit this case even tighter. The B.A.P. noted the debtors' subjective hope that the house would appreciate in value does not control when the house is

9

purchased as a residence. The B.A.P. rejected the argument that because the debtors cashed in investment funds to buy the house, the house should be considered an investment. In fact, the evidence recited by the B.A.P. notes that debtors liquidated an ESOP and put the money into the residence while asserting their belief that the residence was a better investment. Id. at 854. The B.A.P. concluded rather definitively that when the funds at issue are used for or put into a residence, the primary purpose for the funds is family and household use that equates with consumer debt. The B.A.P. explicitly noted: "regardless of the source of the funds used to finance the construction of the residence, the debtors' primary purpose in incurring the debt in question was clearly for family and household purposes under § 101(8)." Id.

As the B.A.P. recognized in Cox, most people hope to sell their residence at a profit when they move. Many even make home improvements with the sole goal of increasing the resale value. However, as the B.A.P. notes, and this Court specifically finds, the debtors primary purpose was still to acquire a residence and to live there.

In this case, it is undisputed that the couple had a family and needed a place to live. Shelter is certainly a higher priority than the possibility of realizing a profit. It is undisputed the family moved into the residence. Debtor's testimony that the home was larger than they needed and was much larger than their previous

10

home is irrelevant. Debtor and her family used the extra space and enjoyed the improvements while they lived there. Debtor's then husband appears to acknowledge this fact in his own bankruptcy filing where he characterized his own debts (dominated by the same deficiency) to be primarily consumer debt. All the other objective evidence—from loan documents and files—reveals the same. To the extent Debtor has argued or testified that investment gain and profit were, in spite of all other indications, the primary purpose, the Court rejects that argument and/or testimony as not credible.

A more recent case noted the pervasive acceptance of the fact that "debt on a personal residence is widely accepted to be 'consumer' debt." In re Hardigan, 490 B.R. 437, 455 (Bankr. S.D. Ga. 2013) (citing In re Woodward, 2009 WL 1651234, at *2 (Bankr. M.D.N.C. June 10, 2009)). The Woodward case, cited in Hardigan specifically stated:

> An overwhelming majority of courts that have considered the issue of whether debt secured by real property used as a debtor's personal residence is consumer debt have held in the affirmative, as a **personal residence is intended primarily for personal, family, or household use rather than for profit**.

Woodward, 2009 WL 1651234 at *2 (citing collecting authority) (emphasis added). Woodward's recitation of the general, widely-accepted rule on this § 707(b) issue is completely consistent with Cox. This Court reiterates its

adherence to that rule and concludes the deficient debt is a consumer debt and § 707(b) applies here.

## II. Would the Granting of Relief in this Case Constitute an Abuse of Bankruptcy Provisions?

Having found that Debtor's debts are primarily consumer debts, section 707(b) can apply and the Court must now decide whether to dismiss the case as an "abuse" of the bankruptcy provisions. 11 U.S.C. § 707(b)(1). While finding abuse is a matter of discretion, Lapke, 428 B.R. at 842 (citing Cox, 315 B.R. 854)), sections 707(b)(2) and (b)(3) provide significant guidance on the determination of abuse. The U.S. Trustee, joined by Northside Bank relies on both sections.

### A. Section 707(b)(2) Creates a Presumption of Abuse in this Case Which Debtor Has Not Rebutted.[1]

As this Court noted previously in discussing the application of § 707(b)(2):

> The Code provides that "the court shall presume abuse exists" if the debtor's gross income and disposable income exceed certain threshold amounts. 11 U.S.C. § 707(b)(2). The calculations which establish those threshold amounts are commonly known as the "Means Test." Batzkiel, 349 B.R. at 584.
>
> The purpose of the Means Test is to "determine whether a case should be dismissed as an abusive filing by measuring the debtor's ability to fund a hypothetical Chapter 13 plan." Batzkiel, 349 B.R. at 584 (quoting In re Renicker, 342 B.R. 304, 308 (Bankr. W.D. Mo. 2006)). The Means Test focuses specifically on "current monthly income," defined as "the debtor's average monthly income for the six calendar

---

[1] Because this case was commenced before April 1, 2013, Debtor's case does not qualify for the increased dollar limits that were effective April 1, 2013. 11 U.S.C. § 104. Therefore, the correct dollar amount for the disposable income limit in this case is $11,725.

12

> months prior to the filing of the bankruptcy case." Batzkiel, 349 B.R. at 584 (quoting In re Pak, 343 B.R. 239, 241 (Bankr. N.D. Cal.2006)). Debtors whose "current monthly income" exceeds the state median monthly income for their household size are subject to the means test, except for certain disabled veterans who qualify for an exception. Batzkiel, 349 B.R. at 584.
>
> "The Means Test creates a statutory formula for assessing whether a rebuttable presumption of abuse arises." Id. at 585.

In re Budig, 387 B.R. 12, 15 (Bankr. N.D. Iowa 2008).

The U.S. Trustee has provided extensive evidence and analysis. It shows the Debtor has annualized income of $146,524.92 which is above the applicable median family income of $64,216 for a household of three. The Court accepts the U.S. Trustee's analysis on this point and concludes § 707(b)(2) applies. Thus, Debtor's disposable income is calculated over a 60-month period to represent what could be paid in a hypothetical Chapter 13. If the amount of disposable income—the amount which Debtor's income exceeds Debtor's reasonably necessary expenses—is greater than $11,725.00, then a presumption of abuse arises. 11 U.S.C. § 707(b)(2)(A).

Part of the U.S. Trustee's evidence was testimony from a specialist at the U.S. Trustee's office with vast experience doing the disposable income and other means test calculations. The U.S. Trustee offered supporting exhibits which reflect

13

the corrected pro forma calculations for Debtor. (U.S. Trustee's Ex. 3).[2] The Court finds this evidence credible and persuasive. The Court accepts the U.S. Trustee's calculation which shows 60 month disposable income of $240,097.80.[3] (Pro forma Form 22A, line 51, U.S. Trustee's Ex. 3, p. 8.) This figure dramatically exceeds the allowed 60 month disposable income of $11,725.00 and gives rise to a presumption of abuse.

The Debtor may rebut the presumption by showing "special circumstances that justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." 11 U.S.C. § 707(b)(2)(B)(i). However, debtor bears a heavy burden to show special circumstances.

> **(ii)** In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide—
>
> **(I)** documentation for such expense or adjustment to income; and
>
> **(II)** a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

---

[2] This analysis was also referenced in and attached to the U.S. Trustee's Motion to Dismiss. (ECF Doc. No. 9, pp. 6–7; ECF Doc. No. 9-3.).

[3] The Court notes that Northside Bank may have reached a slightly different figure in calculating Debtor's pro forma disposable income. (ECF Doc. No. 42, p. 5.) However, as both U.S. Trustee's figures and Northside Bank's figures suggest over $200,000.00 of disposable income, either would lead to a presumption of abuse. For purposes of this opinion, the Court will use the U.S. Trustee's calculation which was supported by the testimony of a staff member of the U.S. Trustee's office.

>**(iii)** The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.
>
>**(iv)** The presumption of abuse may only be rebutted if the additional expenses or adjustments to income referred to in clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of—
>
>>**(I)** 25 percent of the debtor's nonpriority unsecured claims, or $7,025, whichever is greater; or
>>
>>**(II)** $11,725.

11 U.S.C. § 707(b)(2)(B)(ii)–(iv).

Debtor does not suggest that her income is miscalculated. Debtor also does not suggest her scheduled expenses are inaccurate. Rather, Debtor testified somewhat extensively that her expenses as scheduled accurately disclose her monthly expenditures. Debtor testified that some or all of her expenses which are higher than normal are driven by the demands of her job. For instance, Debtor suggested that her expenditure of $800.00 a month for her personal clothing ($1,200 for the household) was required because she was expected to dress a certain way for work. Debtor suggested that her current monthly housing cost, totaling over $2,000.00 a month, was justified because she needed to live in the "right sort of neighborhood" and have the ability to entertain professional contacts/acquaintances at her home. Debtor also suggested that she traveled

15

extensively for her job but travel related expenses were not reimbursed. The Court finds Debtor's testimony to be unpersuasive and that it falls far short of rebutting the presumption of abuse.

To rebut the presumption of abuse, at the very least the Debtor must show "special circumstances" and present "documentation of such expense[s] or adjustment[s] to income" and "a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable." 11 U.S.C. § 707(b)(2)(B)(ii). Debtor's testimony fell far short of showing special circumstances. Debtor also provided no documentation at all for the vast majority of the expenses or documentation that the increased expenses were in fact required by her job. Based on the record, the special circumstances required to rebut the presumption of abuse are simply not present here. As such, the Court finds the Debtor has failed to rebut the presumption of abuse. Debtor's case will be dismissed for that reason.

### B. The Totality of the Circumstances Also Indicate That Granting Relief in this Case Would Constitute an Abuse.

While the § 707(b)(2) analysis is dispositive, the Court also agrees with the U.S. Trustee and Northside Bank that § 707(b)(3) would require dismissal as well. "Section 707(b)(3) explains the criteria for a court to consider when determining whether, if a presumption of abuse does not apply, the filing of a debtor with

primarily consumer debts was, nevertheless, abusive." Lapke, 428 B.R. at 842. Even if the Debtor had rebutted the presumption of abuse, the Court would still find that the Debtor's expenses are an abuse based on "the totality of the circumstances." Section 707(b)(3) lists additional factors for the Court to consider when the presumption of abuse does not apply or is rebutted. Specifically, under § 707(b)(3), "the court shall consider . . . [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3). The Court concludes that, on the record presented, the totality of the circumstances of this case demonstrates abuse of the bankruptcy process.

Debtor has a high income, $146,524.92, which is over twice the applicable median family income of $64,216 for a household of three. Debtor's schedules show total liabilities of $153,891.98. (ECF Doc. No. 1, p. 19). Based on a calculation using the standard IRS expenses, Debtor's disposable income over 60 months is expected to be $240,097.80 (U.S. Trustee's Ex. 3, p. 8.) Thus, Debtor is currently expected to have a significant ability to pay her creditors. In fact, in a Chapter 13 plan, Debtor would likely be able to pay her creditors in full in less than 5 years. Based on the totality of the circumstances, the Court finds that granting Debtor relief under Chapter 7 of the Bankruptcy Code would constitute an abuse.

**WHEREFORE**, the Court finds that Debtor's debts are primarily consumer debts, and **GRANTS** the U.S. Trustee's Motion to Dismiss for Abuse under § 707(b)(1), based on the presumption of abuse under § 707(b)(2) and alternatively based on the totality of the circumstances under § 707(b)(3).

Dated and Entered: August 2, 2013

_____
**THAD J. COLLINS, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT**